UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------- x
IN RE SEPTEMBER 11 LITIGATION              :
                                                                             :        **OPINION AND ORDER GRANTING**
-------------------------------------------------------- x        **PARTIAL JUDGMENT FOR**
CONSOLIDATED EDISON COMPANY OF         :        **PLAINTIFFS AND DISMISSING**
NEW YORK, INC., et al.,                                  :        **REMAINDER OF COMPLAINT**
                                                                             :
                                                Plaintiffs,     :        21 MC 101 (AKH)
                                                                             :
             -against-                                          :        02 Civ. 7188 (AKH)
                                                                             :
THE PORT AUTHORITY OF NEW YORK        :
AND NEW JERSEY,                                        :
                                                                             :
                                                Defendant.    :
-------------------------------------------------------- x

ALVIN K. HELLERSTEIN, U.S.D.J.:

        In 1968, the Port Authority of New York and New Jersey ("the Port Authority")

leased a parcel of land at Washington and Barclay Streets in lower Manhattan for fifty years to

the Consolidated Edison Company of New York, Inc. ("Con Edison"). The Port Authority built

an electrical power substation on the land for Con Edison to operate to supply electricity to the

new World Trade Center complex and the surrounding area. In the 1980s, as anticipated by the

lease, the Port Authority had an office tower built above the substation, 7 World Trade Center

("7WTC"), which it leased for ninety-nine years to developer Larry Silverstein.

        On September 11, 2001, at 5:20 p.m., 7WTC collapsed, brought down by the

raging fires created by the terrorist-related crashes of fuel-laden jumbo jets into Towers One and

Two of the World Trade Center complex. The collapse of 7WTC utterly destroyed the Con

Edison substation beneath it. Since then, Con Edison has built a new substation, as required by

the 1968 lease, and Silverstein has built a new office tower above it.

        In this case, Con Edison argues that the destruction of the substation triggered two

contractual obligations of the Port Authority under the 1968 lease.  First, Con Edison argues that the Port Authority, having insured the substation at Con Edison's expense, must now turn over to Con Edison the proceeds of that insurance coverage.  Second, Con Edison argues that the Port Authority must pay Con Edison the cost of rebuilding the substation, over and above, and independently of, insurance coverage.  Con Edison's argument is that the lease requires the Port Authority to "reimburse" Con Edison for any damage "caused by the acts or omissions of the Port Authority . . . in connection with the construction or maintenance" of 7WTC.  The Port Authority acknowledges that Con Edison is owed insurance proceeds, but denies Con Edison's claim to reimbursement.

Con Edison's current complaint, the Second Amended Complaint, also includes two tort claims.  First, Con Edison argues that the Port Authority negligently designed, constructed, and maintained 7WTC, causing the tower to collapse and destroy the substation.  Second, Con Edison argues that the same negligence was negligence per se, because the Port Authority violated New York State and New York City fire and safety standards in designing, constructing, and maintaining 7WTC.  The Port Authority denies both claims.

After the bulk of discovery, Con Edison moved for summary judgment on its two contract claims, Counts Three and Four of the Second Amended Complaint.  For the reasons stated in this Opinion and Order, I grant judgment to Con Edison on Count Three, the insurance claim, in the amount of $17,580,750, the balance remaining, plus pre-judgment interest in an amount to be determined, and dismiss the remainder of the Second Amended Complaint—Count Four, the reimbursement claim, and Counts One and Two, the tort claims.

## I.  Facts

In the late 1960s, the Port Authority, after conducting surveys and evaluating

choices, engaged Con Edison to furnish electrical power to the planned World Trade Center complex.  On May 29, 1968, the Port Authority and Con Edison entered into a lease and an electricity supply contract.  The lease allowed Con Edison to occupy a trapezoidal parcel of land just north of the complex, known as the "keystone site," for fifty years.  In 1970, the Port Authority built an electrical power substation on the land for Con Edison to operate, to perform the electricity supply contract.

The terms of the lease reflected the parties' entwined relationship.  The Port Authority covenanted, in Section 17 of the lease, to "insure and keep insured the Substation Building to the extent of 100% of the replacement value thereof," and Con Edison covenanted to "pay the Port Authority annually an amount equal to the insurance premium or premiums paid by the Port Authority" for that coverage.  In Section 18 of the lease, Con Edison covenanted to repair or rebuild the substation if it were ever damaged or destroyed, and the Port Authority covenanted to make the proceeds of the insurance coverage "available to [Con Edison] for such purpose."  See In re Sept. 11 Prop. Damage & Bus. Loss Litig., 468 F. Supp. 2d 508, 521 (S.D.N.Y. 2006).

Sections 8 and 16 of the lease provided for the Port Authority's right to build above the substation, and limited its liability to Con Edison should its "acts or omissions . . . in connection with the construction or maintenance" of the new structure or improvements cause "expense" to Con Edison, which, under Sections 15 and 18, was responsible for "maintaining, repairing, replacing, or rebuilding the Substation Building . . . or Substation Equipment."  In Section 8(a), Con Edison recognized and agreed that "the Port Authority may construct wholly or partially on, above or about the Substation Building additional stories, structures, buildings or improvements of whatever design, size and purpose as the Port Authority . . . determine[s]," and,

in Section 8(b), that it would make no claim for constructive eviction or abatement of rent, or

"any claim or demand for damages, consequential or otherwise," in connection with the Port

Authority's exercise of its Section 8(a) rights.  Section 16 defined the Port Authority's liability.

In that section, the Port Authority agreed to

> reimburse [Con Edison] for any expense incurred by [Con Edison]
> in maintaining, repairing, replacing or rebuilding the Substation
> Building or . . . Substation Equipment where such expenses are
> incurred by reason of damage to the Substation Building or . . .
> Substation Equipment caused by the acts or omissions of the Port
> Authority or its agents, contractors or employees in connection
> with the construction or maintenance of the stores, structures,
> buildings or improvements described in Section 8 hereof.

In other words, the Port Authority could build above the substation, and, if it did, it would

reimburse Con Edison for any expenses that it caused by its "acts or omissions . . . in connection

with the construction or maintenance" of that which it built or improved, but it would not be

liable for damages, and Con Edison could not quit the substation.  See In re Sept. 11 Prop.

Damage & Bus. Loss Litig., 468 F. Supp. 2d at 520-21.

In 1980, the Port Authority exercised its Section 8(a) rights by contracting with 7

World Trade Company, L.P. ("7WTCo.") to build 7 World Trade Center above the substation.

Under the contract, Silverstein Properties, Inc., the agent of 7WTCo., was to design, construct,

and operate the forty-seven-story office tower, which the Port Authority was to own, and lease

for ninety-nine years to 7WTCo.  7WTCo. agreed in the contract to submit its plans for the

building to the Port Authority for approval.  Con Edison also acquired a power of review.  By a

1982 consent agreement, Silverstein Development Corp., the general partner of 7WTCo., agreed

to give blueprints of 7WTC to Con Edison, and to stop work if, in Con Edison's "sound

judgment," the tower's construction threatened the substation.  See Jacob Decl. Exh. 11.

7WTC opened in 1987.  Its primary tenant was Salomon Brothers, a large

investment banking company that later merged into Citigroup.  Salomon Brothers installed diesel fuel tanks and generators in the building to supply emergency back-up power to its continuously operating trading floor.  Later, the City of New York leased space in 7WTC to house the command center of its Office of Emergency Management, and installed another diesel fuel tank and generator to supply emergency power to the command center.

At 8:46 a.m. and 9:03 a.m. on September 11, 2001, terrorists flew two "767" jumbo jets into Towers One and Two of the World Trade Center complex.  The Twin Towers fell, streaming fire and debris over the complex and over 7WTC.  7WTC burned throughout the day.  An adjacent water main had burst, vital firefighters had died inside the Twin Towers, and the building's own diesel fuel tanks appeared to feed its fires.  7WTC collapsed at 5:20 p.m., destroying Con Edison's substation but taking no lives.

In June 2004, Con Edison erected a new substation, as Sections 15 and 18 of the 1968 lease required it to do, and restored permanent electrical services to lower Manhattan.  The Port Authority gave Con Edison $20 million of insurance proceeds as a "construction advance."  See Jacob Decl. Exh. 47.  In 2006, Silverstein Properties, Inc. completed a new, forty-two-story 7WTC above the substation, which became the first tower of a new World Trade Center complex.

Con Edison and its subrogated insurers[1] brought this action (02 Civ. 7188) against the Port Authority and the City of New York, alleging claims sounding in negligence but encompassing breach of contract.  See, e.g., Compl. ¶ 28 ("The collapse of 7 World Trade Center and the destruction and damage to the substation . . . were caused by negligence, carelessness, recklessness and breach of contract.").  Also with its subrogated insurers, Con Edison brought a

---

[1] I refer to the Plaintiffs in this action collectively as "Con Edison."

separate action (04 Civ. 7272) against 7WTCo., Silverstein Properties, Citigroup, and the

contractors, engineers, and architects that designed and built 7WTC and its diesel fuel tanks and

emergency generator system, as well as against various airlines and aviation security companies.

On January 12, 2006, I dismissed the claims against the City of New York in 02 Civ. 7188 and

the claims against the contractors, engineers, and architects in 04 Civ. 7272, but denied motions

to dismiss by the Port Authority in 02 Civ. 7188, and by 7WTCo., Silverstein Properties, and

Citigroup in 04 Civ. 7272.  See In re Sept. 11 Prop. Damage & Bus. Loss Litig., 468 F. Supp. 2d

at 511.  On June 26, 2008, I allowed Con Edison to amend its complaint against the Port

Authority in 02 Civ. 7188 to separate its tort claims from its contract claims, and to specify the

lease provisions under which it seeks relief.

  Con Edison filed a Second Amended Complaint against the Port Authority on

July 11, 2008, alleging two tort claims and two contract claims.  On October 29, 2008, Con

Edison moved for summary judgment on its contract claims, Counts Three and Four.  In

opposition, the Port Authority argued, inter alia, that Con Edison's motion was premature

because the parties had not completed discovery as to the meaning of the 1968 lease.  As I

discuss later in this Opinion and Order, the outstanding discovery, as described by the parties,

will not create or help resolve any triable issues.

  I heard oral argument on the motion on February 23, 2009.  After indicating

potential rulings, I allowed the parties to file two sets of supplemental papers on issues that they

considered important, including their respective interpretations of the "acts or omissions"

language of Section 16 of their lease, and the viability of Con Edison's tort claims alongside its

contract claims.  On May 21, 2009, at Con Edison's request, I allowed the parties to file

additional supplemental papers, suggesting that I considered that summary judgment may be

appropriate on all counts of the Second Amended Complaint.  I am now in a position to rule on the entire record created by the parties, after extensive presentation of the legal issues.

## II. Standard

To succeed on a motion for summary judgment, the moving party must show that "there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A "genuine issue" of "material fact" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The court must "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." Roe v. City of Waterbury, 542 F.3d 31, 35 (2d Cir. 2008) (citations omitted).  However, "[m]ere speculation and conjecture is insufficient to preclude the granting of the motion." Harlen Assocs. v. Vill. of Mineola, 273 F.3d 494, 499 (2d Cir. 2001).

On a motion for summary judgment, the court may search the record and give complete relief, and may even grant judgment for the nonmoving party if "no factual dispute exists and the non-movant is entitled to summary judgment as a matter of law." Ramsey v. Coughlin, 94 F.3d 71, 73 (2d Cir. 1996) (internal citation omitted); see, e.g., Island Park, LLC v. CSX Transp., 559 F.3d 96, 100 (2d Cir. 2009).  "[A] district court's independent raising and granting of summary judgment in favor of the nonmoving party is 'an accepted method of expediting litigation.'" Ramsey, 94 F.3d at 74 (quoting Coach Leatherware Co. v. Ann Taylor, Inc., 933 F.2d 162, 167 (2d Cir. 1991)).  However, "summary judgment should not be granted . . . unless the losing party has been given an opportunity to demonstrate that there are genuine material issues for trial." Id. (quoting Hispanics for Fair & Equitable Reapportionment v. Griffin, 958 F.2d 24, 25 (2d Cir. 1992)).  Thus, the losing party must have submitted "all of the

evidentiary materials that a party might submit in response to a motion for summary judgment," and "those materials [must] show that no material dispute of fact exists and that the other party is entitled to judgment as a matter of law." Id.

### III. The Contract Claims

I grant judgment to Con Edison on Count Three, the insurance claim, and dismiss Count Four, the reimbursement claim.

### a.   The Insurance Claim

The 1968 lease provided that Con Edison would insure the substation through the Port Authority.  Section 17(a) required the Port Authority to "insure and keep insured the Substation Building to the extent of 100% of the replacement value thereof," by obtaining an insurance policy in the name of, and payable to, the Port Authority.  In turn, Section 17(c) required Con Edison to pay the Port Authority an amount equal to whatever premiums the Port Authority paid to maintain that insurance coverage.  Section 18 provided that the proceeds of such coverage would "be made available" to Con Edison if it were ever required to remove debris from, repair, or rebuild the substation.

The parties agree that the Port Authority complied with Section 17(a) by procuring insurance coverage for the substation.  It obtained a blanket insurance policy of $1.5 billion per occurrence that covered the entire World Trade Center complex, including Con Edison's substation.  The parties further agree that Con Edison complied with Section 17(c) by paying the Port Authority annually for the benefit of that insurance coverage, and that Con Edison has helped the Port Authority to file its insurance claim arising from the destruction of the substation.  The Port Authority has received at least $985 million from its insurers.  See Sachs Decl. Exh. 8.  On June 3, 2004, after Con Edison rebuilt the substation, the Port Authority

gave Con Edison $20 million as an "advance" payment of insurance proceeds.  See Jacob Decl. Exh. 47.  Con Edison accepted the funds as a partial payment, but demanded the full amount of its replacement costs.  In 2008, in related litigation in this court, the Port Authority and its insurers reported that they had agreed to value the cost of replacing the substation at $37,580,750.  See Status Report at 2, Certain Underwriters at Lloyd's v. Port Auth. of N.Y. & N.J., No. 05 Civ. 5239 (BSJ) (S.D.N.Y. Sept. 2, 2008).

Con Edison argues that the Port Authority, having received insurance proceeds from a policy that covered the substation, must now "make available" to Con Edison "100% of the replacement value" of the substation, that is, $37,580,750 less the $20 million already paid. The Port Authority does not dispute its ultimate obligation under Sections 17 and 18 of the lease, but argues that Con Edison's demand is premature.  Specifically, the Port Authority argues that it should not have to turn over to Con Edison the insurance proceeds for the substation until the Port Authority's insurers have paid out its entire claim under the blanket policy.  It argues also that discovery should continue as to the replacement value of the substation, for the new building is a substantial improvement, not a mere replacement.

I rule that the Port Authority shall make available to Con Edison, without further delay, the remaining insurance proceeds up to the agreed value, $37,580,750, the amount designated for substation replacement, in discharge of Con Edison's claims on this issue.  The Port Authority's principal argument would exploit its decision to purchase a blanket insurance policy and enable the Port Authority to frustrate Con Edison's right to the proceeds of coverage that its premiums had funded.  The Port Authority argues that the parties contemplated that it would obtain a blanket policy, since Section 17(c) requires Con Edison to pay the Port Authority amounts equaling the premium or premiums "allocable to" substation coverage, and such

allocation would be possible only within a policy of blanket coverage.  However, even if Con

Edison expected the Port Authority to purchase a single policy to insure the entire complex, there

is no reason for Con Edison to be obliged to wait.  The lease contains no such imperative.

Section 18 conditions turnover of proceeds to Con Edison only on the losses being "covered by

insurance"—that is, on the Port Authority and its insurers agreeing that the losses constitute a

deserving claim.  They have done so, and valued the claim at $37,580,750.  For this same reason,

the Port Authority's argument that the replacement value of the substation remains undetermined

also fails.  I hold that there is no genuine issue of material fact as to Con Edison's entitlement to

immediate judgment on its insurance claim.

      The Port Authority expresses concern that its overall claim for the entire complex

might be shortchanged by its insurers, despite their agreement that the substation claim deserves

payment in the amount of $37,580,750.  In that event, the Port Authority argues, granting

immediate turnover to Con Edison will have made the Port Authority an excess insurer of the

substation, which the lease does not expressly require.  The argument is false.  The lease

agreement did not make Con Edison an insurer of the Port Authority.  Whether the Port

Authority succeeds or not on its overall claim, collecting more or less than it is due is its business

and its risk, not Con Edison's, and derives from the latitude which Section 17 gave the Port

Authority either to insure or procure insurance for the substation.  Con Edison has performed its

obligation to pay for insurance coverage.

      Accordingly, I grant judgment to Con Edison on Count Three of its Second

Amended Complaint in the amount of $17,580,750, the balance remaining after the Port

Authority paid Con Edison a $20 million advance, plus pre-judgment interest in an amount to be

determined.  The Port Authority, noting my discretion as to whether to award such interest

against a public corporation, argues that I should award no or little interest.  However, because

the Port Authority has wrongly withheld from Con Edison the proceeds of insurance coverage

for which Con Edison paid, I rule that Con Edison should receive just compensation for the

breach and the delay, which I find to be interest at the statutory rate of nine percent, from thirty

days after the date of demand.  See N.Y. C.P.L.R. § 5001(b) & § 5004; Denio v. State of New

York, 7 N.Y.3d 159, 165 (2006); see also Smith Barney, Harris Upham & Co. v.

Liechtensteinische Landesbank, 866 F. Supp. 114, 117 (S.D.N.Y. 1994).  The parties shall agree

to this calculation, and submit the same to me, by joint letter describing their agreements and

differences, if any, on the issue, within ten days of this Opinion and Order.

### b.  The Reimbursement Claim

Con Edison moves also for summary judgment on its claim under Section

16 of the 1968 lease that the Port Authority has the obligation, independent of insurance, to

"reimburse" Con Edison for the cost of replacing the substation building and the equipment

therein.

Section 16 provides:

The Port Authority shall reimburse [Con Edison] for any expense
incurred by [Con Edison] in maintaining, repairing, replacing or
rebuilding the Substation Building or . . . Substation Equipment
where such expenses are incurred by reason of damage to the
Substation Building or . . . Substation Equipment caused by the
acts or omissions of the Port Authority or its agents, contractors or
employees in connection with the construction or maintenance of
the stories, structures, buildings or improvements described in
Section 8 hereof.

As discussed earlier, Section 8 granted the Port Authority the right to "construct wholly or

partially on, above or about the Substation Building additional stories, structures, buildings or

improvements of whatever design, size and purpose as the Port Authority . . . determine[s]."

Section 16 provided the conditions of the Port Authority's liability to Con Edison.

      The issue focuses on the clause in Section 16, "caused by the acts or omissions of the Port Authority," and whether that clause imposes a strict liability standard on the Port Authority for damage caused to the substation at any time during the fifty-year leasehold, or a standard based on proof of fault limited to the period of active construction or maintenance of the office tower, and limited also to damages proximately caused by "acts or omissions" relative to such construction or maintenance.

      "In interpreting a contract, the intent of the parties governs." Chapman v. N.Y. State Div. for Youth, 546 F.3d 230, 236 (2d Cir. 2008) (quoting Am. Express Bank Ltd. v. Uniroyal, Inc., 562 N.Y.S.2d 613 (App. Div. 1990)); see II E. Allan Farnsworth, Farnsworth on Contracts § 7.9, at 275 (3d ed. 2004) ("[T]he search for meaning begins with the meaning attached by both parties to the contract language.").  "The best evidence of what parties to a written agreement intend is what they say in their writing." Greenfield v. Philles Records, 98 N.Y.2d 562, 569 (2002) (quoting Slamow v. Del Col, 79 N.Y.2d 1016, 1018 (1992)).  Therefore, I must examine the words of the lease themselves "to discover the intention which the parties have formulated in its written language." See Wirth & Hamid Fair Booking, Inc. v. Wirth, 265 N.Y. 214, 219 (1934), quoted in Israel v. Chabra, 537 F.3d 86, 94 (2d Cir. 2008).  The parties distilled their intent in the words of the lease, choosing them not only for their own temporary use, but for the use of all readers over its fifty-year life.  "[S]ummary judgment when interpreting a contract may be granted only when 'the intent of the parties can be ascertained from the face of their agreement.'" Postlewaite v. McGraw-Hill, Inc., 411 F.3d 63, 67 (2d Cir. 2005) (quoting Ruttenberg v. Davidge Data Sys. Corp., 626 N.Y.S.2d 174, 178 (App. Div. 1995)); see Wards Co. v. Stamford Ridgeway Assocs., 761 F.2d 117, 120 (2d Cir. 1985) ("In an action on a contract

. . . summary judgment is perforce improper unless the terms of the agreement are 'wholly unambiguous.'" (citation omitted)).  On the other hand, "when the meaning of the contract is ambiguous and the intent of the parties becomes a matter of inquiry, a question of fact is presented which cannot be resolved on a motion for summary judgment." Postlewaite, 411 F.3d at 67; see NFL Enters. LLC v. Comcast Cable Comm's, LLC, 851 N.Y.S.2d 551, 557 (App. Div. 2008).

   "Under New York law, the presence or absence of ambiguity is determined by looking within the four corners of the document, without reference to extrinsic evidence." Chapman, 546 F.3d at 236 (citing Kass v. Kass, 91 N.Y.2d 554, 566 (1998)).  "An agreement is ambiguous when 'the agreement on its face is reasonably susceptible of more than one interpretation.'" Nappy v. Nappy, 836 N.Y.S.2d 256, 257 (App. Div. 2007) (quoting Chimart Assocs. v. Paul, 66 N.Y.2d 570, 573 (1986)).  Thus, "[w]here contractual language is susceptible of at least two fairly reasonable interpretations, this presents a triable issue of fact, and summary judgment [is] improper." Garza v. Marine Transp. Lines, Inc., 861 F.2d 23, 26 (2d Cir. 1988) (quoting Aetna Casualty & Surety Co. v. Giesow, 412 F.2d 468, 471 (2d Cir. 1969)).  However, "if 'a contract is straightforward and unambiguous, its interpretation presents a question of law for the court[,] to be made without resort to extrinsic evidence.'" Postlewaite, 411 F.3d at 67 (citation omitted).

   I note that, in the "relatively rare case[] in which the parties attached the same meaning to the language in question," the court may simply "carry out their intentions." Farnsworth § 7.9, at 285.  In this case, however, there is no evidence of any specific, shared understanding of Con Edison and the Port Authority.  Con Edison relies only on the language of the lease, and the Port Authority offers only unhelpful deposition testimony.  For example,

Arthur Bach, a Port Authority attorney who helped to draft the lease, testified that he understood Section 16 to require negligence, and to apply only during the active construction of 7WTC, see Jacob Decl. Exh. 6 at 128-29, but his private understanding is not relevant to the issue of shared intent, see Zell v. Am. Seating Co., 138 F.2d 641, 647 (2d Cir. 1943).  Bach also testified that it was not likely that the Port Authority would have agreed to a broad indemnification clause, see Jacob Decl. Exh. 6 at 96-97, but such testimony is speculative and also not relevant to the issue of shared intent.  There is no evidence whatever of what, if anything, the parties communicated to each other about the meaning of Section 16, and none of the objective and reasonable expectations of the parties.  See SR Int'l Bus. Ins. Co., Ltd. v. World Trade Ctr. Props., LLC, 467 F.3d 107, 125 (2d Cir. 2006).  The additional discovery proposed by the Port Authority— depositions of post-1968 Con Edison employees about how Con Edison's actions in the years after signing the lease may have reflected, or been inconsistent with, its conception of its lease rights—will not aid any inquiry of contractual interpretation, because the private, unexpressed intentions of either party are ineffective.  See id.; Zell, 138 F.2d at 647.

I rule that Section 16 is unambiguous, that resort to extrinsic evidence is unnecessary, and that summary judgment is appropriate.  The phrase, "caused by the acts or omissions of the Port Authority," cannot fairly be read to impart a requirement of fault, whether of negligence or intention, to trigger the Port Authority's reimbursement obligation.  See Nappy, 836 N.Y.S.2d at 257.  The clause does not mention negligence, wrongfulness, or fault of any kind.  The parties knew how to use the term negligence, for they did so elsewhere in the lease, as in Section 40(b).  Read as a whole, the lease gives no indication that the parties intended to make Section 16 a negligence provision, but somehow neglected to use the word "negligence" or any equivalent word of culpability.  The parties were sophisticated commercial and governmental

entities.  Their agreement shows that they exercised prudence and care in drafting the lease.  If they did not mention negligence to qualify "acts or omissions," no such qualification should be added decades after the lease was executed.  "[W]ords do not become ambiguous simply because lawyers or laymen contend for different meanings," Wards Co., 761 F.2d at 120 (quoting Downs v. Nat'l Cas. Co., 146 Conn. 490, 494 (1959)), nor may they take on new meanings and implications when the document in which they appear admits of none.  The Port Authority argues that New York courts, in other cases involving other contracts, have sometimes used the terms "acts or omissions" and "negligence" interchangeably, see, e.g., Trimpoli v. State of New York, 249 N.Y.S.2d 154, 157 (App. Div. 1964), but these few cases, in addition to being factually distinguishable, offer no analysis of the issue, and hardly amount to generally applicable statements of New York law.  Absent any indication in this lease that the parties attributed such special meaning to the phrase here, I cannot accept the Port Authority's argument.

The plain meaning of Section 16 fits in the context of the lease as a whole.  See Nappy, 836 N.Y.S.2d at 257 ("In deciding whether an agreement is ambiguous, the court 'should examine the entire contract and consider the relation of the parties and the circumstances under which it was executed.'" (quoting Kass, 91 N.Y.2d at 554)).  Sections 8, 15, and 18 of the lease exposed Con Edison to substantial risk from rights granted to the Port Authority.  Section 8 granted the Port Authority an essentially unlimited right to build any structure whatever above and alongside the substation, and did not require it to consult Con Edison or provide for any power of review.  Section 15, adding to Con Edison's risk, obligated Con Edison to undertake "all care, repair, replacement and rebuilding" of the substation, and Section 18 likewise required Con Edison to repair and rebuild the substation.  The insurance provisions ensured that Con

Edison would benefit from coverage against the "hazards and risks" included in the standard New York form of fire insurance policy. However, if the Port Authority, in exercising its Section 8 rights, caused some type of damage beyond insured replacement value, or, if for any other reason, insurance protection failed or was inadequate, Section 16 gave Con Edison a measure of protection—not in all cases, but from "acts or omissions of the Port Authority . . . in connection with the construction or maintenance" of 7WTC.

Thus, Section 8, and the right it gave the Port Authority to build, and Section 16, and the circumstances of the duty it imposed on the Port Authority to reimburse, are complementary sections that are to be read together, along with Sections 17 and 18, which provided for the extent of insurance coverage and the obligation to turn over insurance proceeds. Other provisions of the lease—like Section 40(b), which imposes negligence liability on the Port Authority for certain types of claims, and Section 35(e), which limits Con Edison's remedies for damage caused by forces beyond the Port Authority's control—specified that they did not "relieve" the Port Authority of its Section 16 reimbursement obligation, because that section created a heightened obligation in response to the Port Authority's "acts or omissions," in connection with particular circumstances, the construction of a building or other improvement above the substation and the maintenance thereof.

The phrase "caused by the acts or omissions of the Port Authority," tied to the phrase immediately following, "in connection with the construction or maintenance of the stories, structures, buildings or improvements described in Section 8 hereof," was not intended to extend to damages arising when some outside event causes damage to the structure of the building, in turn causing damage, allegedly in combination with the latent effects of design negligence, to the Con Edison structure beneath and beside the building. The acts of the

16

terrorists against Towers One and Two were not "acts or omissions" of the Port Authority in relation to 7WTC, nor were the design and existence of 7WTC incidents "in connection with the construction or maintenance" of that building.  Con Edison's interpretation of Section 16 is not a fair reading of its terms and conditions.  See Nappy, 836 N.Y.S.2d at 257.  Con Edison's argument would eliminate the phrase "acts or omissions" and disregard the qualification of "construction or maintenance," see Rothenberg v. Lincoln Farm Camp, Inc., 755 F.2d 1017, 1019 (2d Cir. 1985) ("[A]n interpretation that gives a reasonable and effective meaning to all the terms of a contract is generally preferred to one that leaves a part unreasonable or of no effect."), and would require me "to suspend the rules of common English usage" to find ambiguity in Section 16.  Wards Co., 761 F.2d at 117; see Seiden Assocs., Inc. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir. 1992) (holding that language is unambiguous if suggested alternate interpretation goes beyond reasonable and ordinary meaning).

        The phrase "caused by the acts or omissions of the Port Authority" limited the Port Authority's reimbursement obligation to damages proximate in time and sequence to the particular "acts or omissions" that are alleged to have caused Con Edison's "expense."   In contract law, as in tort law, causation has an element of proximateness, because contracting parties must be able to foresee the implications of their promises and the costs of breach.  See Farnsworth § 12.1, at 150-53; see also Exxon Co. v. Sofec, Inc., 517 U.S. 830, 839-40 (1996) ("Although the principles of legal causation sometimes receive labels in contract analysis different from the 'proximate causation' label most frequently employed in tort analysis, these principles nevertheless exist to restrict liability in contract as well.").  The lack of a temporal connection between the damage and the acts or omissions alleged to have caused it is inconsistent with this principle.  Reasonable temporal proximity to the period of construction or

maintenance was required because, after a certain point, the liability of the Port Authority must end.  Cf. N.Y. C.P.L.R. § 214-d (limiting personal injury and property damage liability of architects and engineers to ten years).  Section 16 clearly encompassed some event or occurrence during construction or in maintenance, causing damage palpably related to the alleged act or omission.  Con Edison's interpretation of the clause would create liability for latent design defects, potentially causing liability many years after construction—a result totally inconsistent with the scheme of the lease.  This interpretation is unreasonable, and insufficient to create ambiguity.  See Nappy, 836 N.Y.S.2d at 257.

Section 16 of the lease is unambiguous, see Wards Co., 761 F.2d at 120, and there is no need to consider extrinsic evidence or to conduct a trial to determine its proper construction, see Bethlehem Steel Co. v. Turner Constr. Co., 2 N.Y.2d 456, 460 (1957) ("[W]here the intention of the parties may be gathered from the four corners of the instrument, interpretation of the contract is a question of law and no trial is necessary to determine the legal effect of the contract.").  "[R]easonable persons could not differ as to its meaning."  Rothenberg, 755 F.2d at 1019; see Nappy, 836 N.Y.S.2d at 257.

Con Edison alleges, in Count Four of its Second Amended Complaint, that the Port Authority's original design and construction of the forty-seven-story office tower in the 1980s breached Section 16 of the lease, causing the destruction of the substation.  Con Edison alleges that the Port Authority,

> by its acts and omissions in exercising its rights under § 8(a) of the lease, including, but not limited to, the design, approval, inspection, installation, alteration, maintenance, operation, conduct and control of [7WTC] and its load bearing structural systems, structural modifications, diesel-fueled power generation systems and appurtenant fuel oil and distribution systems, and fire protection systems,

breached Section 16.  2d Am. Compl. ¶ 61.  Con Edison alleges seven specific "acts or omissions":  1) inadequate fireproofing; 2) inadequate firestopping; 3) inadequate attachments between steel connections, beams, girders, and columns; 4) violation of New York City building code as to bracing of columns; 5) inadequate robustness, redundancy, and ductility; 6) failure to investigate and improve 7WTC after the 1993 bombing of Tower One; and 7) improper maximization of office space.  Pl's Post-Hr'g Mem. 12 (Apr. 24, 2008).

The first, second, third, fifth, and seventh alleged "acts or omissions" are claims of faulty design in 1980 that cannot constitute the specific, particularized incidents of action or inaction, causing damage temporally proximate to the construction or maintenance of 7WTC that are required for reimbursement under the lease.  The sixth item amounts to a claim of a faulty condition arising from the 1980 acts and omissions, and is likewise deficient.  The fourth item is likewise unspecific, and ignores the Port Authority's exemption from the New York City Building Code.  See In re Sept. 11 Prop. Damage & Bus. Loss Litig., 468 F. Supp. 2d at 527. These purported "acts or omissions" are allegations of faulty design, not embraced by Section 16.

Accordingly, I hold that there is no genuine issue of material fact as to whether these allegations, and proofs supporting them, would suffice to establish Con Edison's claims under Section 16 of the lease.  Further discovery would not add to the material facts relevant to interpretation of Section 16, as is plainly shown by the several submissions of Con Edison, including those filed in response to my notice that I was considering whether summary judgment on all issues might be appropriate.  See Ramsey, 94 F.3d at 74.  Accordingly, summary judgment on Count Four is both substantively deserved, see Postlewaite, 411 F.3d at 67, and procedurally appropriate, see Ramsey, 94 F.3d at 74.  I grant judgment dismissing Count Four.

**IV. The Tort Claims**

Con Edison's Second Amended Complaint includes two tort claims, in addition to its claims under the lease for insurance proceeds and reimbursement of damages. Count One of the Second Amended Complaint alleges that the Port Authority negligently designed, constructed, and maintained 7WTC, and that, as a result of such negligence, the tower collapsed and destroyed the substation. Count Two alleges that the same negligence was negligence per se because the Port Authority violated "New York City and State fire and safety codes and regulations." However, Con Edison cannot succeed on either tort claim, for the Port Authority did not owe it a duty in tort additional to its duties under the lease, and a negligence per se claim cannot be maintained without proof that a state statute or municipal ordinance was violated. Thus, for the reasons described in the next sections, both tort claims cannot succeed, and I order them dismissed.

A district court "has the power to dismiss a complaint sua sponte for failure to state a claim on which relief can be granted." Thomas v. Scully, 943 F.2d 259, 260 (2d Cir. 1991). It has the power as well to search the record on a motion for summary judgment, and to grant judgment, either granting or dismissing a claim, even when the party entitled to such relief has not yet argued for it. See Citadel Mgmt., Inc. v. Telesis Trust, Inc., 123 F. Supp. 2d 133, 145 (S.D.N.Y. 2000) ("[T]he Court has discretion to dismiss claims sua sponte pursuant to Rule 12(b)(6), particularly where it is clear that a plaintiff could not have prevailed on the facts as alleged in the complaint."); see also Korea Life Ins. Co. v. Morgan Gaur. Trust Co. of N.Y., 269 F. Supp. 2d 424, 435 n.7 (S.D.N.Y. 2003). In both instances, the court should not do so without giving the plaintiff an opportunity to be heard. Thomas, 943 F.2d at 260 (citing Perez v. Ortiz, 849 F.2d 793, 797 (2d Cir. 1988) ("[The] court on its own initiative may note the inadequacy of

20

the complaint and dismiss it for failure to state a claim as long as the procedure employed is fair.")); see Citadel, 123 F. Supp. 2d at 147 (requiring "notice and an opportunity to be heard" (citing Wachter v. County of Herkimer, 35 F.3d 77, 82 (2d Cir. 1994))).

Con Edison has received such an opportunity. As described above, I reserved decision at oral argument on Con Edison's motion, noting my skepticism that Con Edison's tort claims stated a valid claim for relief, and allowed the parties to submit two sets of supplemental papers on that and other questions. At Con Edison's request, I allowed a third set of papers, in which Con Edison again directly addressed the viability of its two tort claims. Con Edison has been heard in full on this issue, and further briefing or argument is unnecessary.

### a. The Prior Proceedings

Con Edison has mingled its tort and contract theories of action throughout this litigation. In its initial complaint, Con Edison alleged claims that sounded mainly in negligence, but with an admixture of contract as the setting for the torts. See, e.g., Compl. ¶ 28 ("The collapse of 7 World Trade Center and the destruction and damage to the substation . . . were caused by negligence, carelessness, recklessness and breach of contract."); id. ¶ 29 ("Defendant's negligence, carelessness, recklessness and/or breach of lease was the proximate cause of, and materially contributed to, plaintiff's damage."). Thus, as I later observed, both Con Edison's notice of claim and its initial suit, "although sounding in negligence, placed that negligence in the context of the Port Authority's contractual duty." Consol. Edison Co. of N.Y., Inc. v. Port Auth. of N.Y. & N.J., 21 MC 101 (AKH), 2008 U.S. Dist. LEXIS 50290, at *15 (S.D.N.Y. June 26, 2008).

In 2007, after five years and some discovery, Con Edison filed a second lawsuit for its breach of contract claims (07 Civ. 10582). The Port Authority moved to dismiss, alleging

that Con Edison had failed to give it jurisdictional notice before suit, and that it could not later

allege contract claims, relying on a notice that had focused argument on tort.  I dismissed the

new suit on other grounds, holding that the lease claims "were comprehended by [Con Edison's]

original Notice of Claim and lawsuit," that "the provisions of the lease [had] figured into the case

from its inception," and that Con Edison's lack of precision had not prejudiced the Port

Authority, as it would have responded no differently if Con Edison had distinctly alleged both

negligent conduct yielding tort liability and non-negligent conduct yielding contract liability.  Id.

at *37-*38.  I held that there was no need for a separate action, and allowed Con Edison to

amend its earlier pleadings, pursuant to Fed. R. Civ. P. 15(c)(1)(B), to state its lease claims more

clearly.  Id. at *38-*39.  The amendment resulted in the current complaint.

### b. The Negligence Claim

Parties frequently join contract and tort claims for relief based on the same

alleged damage, causing "confusion and unnecessary complexity."  W. Page Keeton et al.,

Prosser and Keeton on the Law of Torts § 92, at 665 (5th ed. 1984).  But contract and tort claims

for relief may coexist in limited circumstances, only when a defendant "has breached a duty of

care distinct from its contractual obligations," or when a defendant's "tortious conduct [is]

separate and apart from its failure to fulfill its contractual obligations."  New York Univ. v.

Cont'l Ins. Co., 87 N.Y.2d 308, 316 (1995).  A tort claim will not lie as a means to enforce a

contractual bargain.  Id.; see Lee S. Kreindler et al., N.Y. Law of Torts § 6.13 (1997).

The leading case is Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98

F.3d 13 (2d Cir. 1996).  There, the plaintiff alleged parallel claims for breach of contract and

fraud.  The Second Circuit described a three-part test, holding that, in order to maintain a fraud

claim alongside a breach of contract claim, the allegedly defrauded plaintiff must "(i)

demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." Id. at 20 (citations omitted).  This test elaborated on the more general formulation of Sommer v. Fed. Signal Corp., 79 N.Y.2d 540 (1992).  In that case, the New York Court of Appeals addressed how to determine whether a plaintiff's tort claim is distinct enough to coexist alongside a contract claim, where both arise from the same conduct.  It examined whether the allegedly breached tort duty was independent of the contractual duty, whether the alleged tort duty was imposed by law by virtue of the parties' relationship, and whether, all told, the plaintiff was seeking to enforce a contract bargain or to vindicate the breach of a tort duty.  Id. at 551-52; see also Medinol Ltd. v. Boston Scientific Corp., 346 F. Supp. 2d 575, 606 (S.D.N.Y. 2004) (holding that comprehensive nature of representations and covenants of supply agreement was inconsistent with tort of misappropriation of trade secrets); Great Earth Int'l Franchising Corp. v. Milks Dev., 311 F. Supp. 2d 419, 425-32 (S.D.N.Y. 2004) (holding that allegedly fraudulent labeling of drug contents raised only breach of contract claim, unless party could prove viable fraud-based damages).

    The lease between Con Edison and the Port Authority was comprehensive, and inconsistent with an independent obligation in tort.  Con Edison's tort claims duplicate its breach of contract claim for reimbursement, and thus contradict "the basic rule . . . that a tort claim cannot be a reiteration of a breach of contract claim." Great Earth, 311 F. Supp. 2d at 428.  Con Edison bargained to receive particular relief, limited to reimbursement of the cost of replacement buildings and equipment, if the Port Authority, through its acts or omissions, damaged the substation in connection with constructing or maintaining 7WTC.  Con Edison seeks to enforce

that bargain through its claim for reimbursement, along with its claim for insurance.  See New York Univ., 87 N.Y.2d at 316.  Its original complaint inextricably mixed its tort and contract claims.  See Consol. Edison Co., 2008 U.S. Dist. LEXIS 50290, at *37-*38.  Though the Second Amended Complaint detached the tort claims from the reimbursement claim, the substance of the tort claims remained the same.  A plaintiff may not "transform a simple breach of contract into a tort claim" by using the language of tort law.  431 Conklin Corp. v. Rice, 580 N.Y.S.2d 475, 476 (App. Div. 1992) (citing Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 70 N.Y.2d 382, 390 (1987)).

None of the three Bridgestone/Firestone exceptions applies.  The first exception applies if the tort claims arise from a duty "separate from the duty to perform under the contract."  Bridgestone/Firestone, 98 F.3d at 20; see Clark-Fitzpatrick, 70 N.Y.2d at 389 ("[A] simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated.").  Here, all four counts, tort and contract, plead the same acts of destruction and seek essentially the same relief, reimbursement of the costs of substation replacement.  As Con Edison acknowledged when arguing that its notice of claim supports both tort claims and contract claims, "the predicate acts and omissions supporting the contract cause of action under Section 16 and the negligence causes of action are precisely the same.  The only difference between the two causes of action is whether these acts or omissions need to be negligent acts or omissions."  Pl's Reply Mem. 14 (June 9, 2008).  If negligence is required, it is because the contract so provided, either by specific provisions or by implication.  If negligence is not required, it is also because the contract did not so provide.

The lease comprehensively addressed the question of what Con Edison is to receive if the Port Authority causes damage to the substation by any specific act or failure to act

with respect to 7WTC.  Con Edison naturally alleges, pursuant to Section 16, that the Port

Authority committed "acts and omissions" in the "design, approval, inspection, installation,

alteration, maintenance, operation, conduct and control of [7WTC] and its internal components"

which caused damage.  2d Am. Compl. ¶ 61.  Yet, Con Edison also charges—in tort—that its

damage resulted from the Port Authority's "negligent design, approval, inspection, installation,

maintenance, operation, conduct and control of 7 World Trade Center . . . and the diesel fuel

tanks therein."  Id. ¶ 35.  Con Edison's tort claim, arising from the same duty to Con Edison and

well-contemplated by the provisions of the lease, is redundant and not independently viable.  The

lease paired the right to build with the obligation to pay for the effects of doing so:  Section 8(a)

granted the Port Authority permission to build 7WTC, while Section 16 limited Con Edison's

recovery to reimbursement of the costs of replacing building and equipment, Section 8(b)

disallowed Con Edison to assert claims for damages, and Section 18 provided for turnover of

insurance proceeds.  Permitting a further obligation would distort the balance for which the

parties bargained.

    Other sections of the lease reflected its comprehensiveness.  Section 31 granted

the Port Authority the right to pursue remedies outside the lease, but did not do the same for Con

Edison.  It provided that "[a]ll remedies provided in this Agreement shall be deemed cumulative

and additional and not in lieu of or exclusive of each other or of any other remedy available to

the Port Authority at law or in equity."  The lease also contained an integration clause.  In

Section 42, the parties agreed that the lease "constitutes the entire agreement and understanding

of the parties on the subject matter and may not be changed, modified, discharged or extended

except by written instrument duly executed by the Port Authority and [Con Edison]," and that

"no representations or warranties shall be binding upon either of them unless expressed in

writing in this Agreement."  Section 25 of the lease provided that "[n]o greater rights or privileges with respect to the use of the premises or the Facility or any part thereof are granted or intended to be granted to [Con Edison] by this Agreement or by any provision hereof than the rights and privileges expressly and specifically granted."  None of these sections expressly disallows an independent tort claim by Con Edison, but they are further evidence of the parties' intention that the Port Authority's contractual duty be its whole duty, and that any tort duty be subsumed within that duty.

Con Edison relies on Duane Reade v. Reva Holding Corp., 818 N.Y.S.2d 9 (App. Div. 2006).  In Reva, the plaintiff leased a ground-level store from the defendant, and alleged that the defendant breached the lease, and was also negligent, in adding a second story to the building that damaged the plaintiff's store.  The Appellate Division allowed the plaintiff to bring both breach of contract and negligence claims, holding that the building owner had a "common-law duty, independent of any contractual obligation imposed by the lease, to exercise reasonable care in performing the work on the roof . . . so as to avoid damaging the demised premises below."  Id. at 16.  The lease in Reva, however, lacked the comprehensiveness with which the 1968 lease between Con Edison and the Port Authority established the rights and liabilities arising from the construction of 7WTC.  Notably, it lacked any damages reimbursement provision comparable to Section 16 of the Con Edison/Port Authority lease, and appears to have provided only for liability for interruption of business.  Thus, in Reva and unlike here, there was no "contractual obligation imposed by the lease" to pay for damage caused to the demised premises.  See id.

In Sommer, the New York Court of Appeals held that the public interest can create a tort duty independent enough to avoid the general rule against coincident tort and

contract claims.  79 N.Y.2d at 553; <u>see</u> <u>New York Univ.</u>, 87 N.Y.2d at 316 ("The very nature of a contractual obligation, and the public interest in seeing it performed with reasonable care, may give rise to a duty of reasonable care in performance of the contract obligations, and the breach of that independent duty will give rise to a tort claim.").  "New York courts after <u>Sommer</u> have suggested that <u>Sommer</u> should be limited to cases involving threats to the public health or safety, rather than where a party is essentially suing to enforce a contract."  <u>Great Earth</u>, 311 F. Supp. 2d at 426.  For example, in <u>Sommer</u>, the Court of Appeals allowed a client of a fire alarm company to allege both breach of contract and tort claims against the company for failing to respond to an alarm from the client's building, because "a significant public interest" hinged on the company performing its contractual duty without negligence.  79 N.Y.2d at 553.  As the Court of Appeals later explained, "[t]he alarm company's duty, separate and apart from its contract obligations, arose from the very nature of its services—to protect people and property from physical harm."  <u>New York Univ.</u>, 87 N.Y.2d at 317.  Like <u>Great Earth</u>, which involved labeling of pharmaceuticals, <u>Sommer</u> recognized a public interest tort duty when the purpose of the contractual duty was to assure safety.  Here, the Port Authority did not contract to protect Con Edison.  Urban construction projects may implicate the safety of the public, but not every construction project so implicates the public interest as to create an independent tort duty.  <u>See</u> <u>Trs. of Columbia Univ. v. Gwathmey Siegel & Assocs. Architects</u>, 601 N.Y.S.2d 116, 118 (App. Div. 1993).  Courts have recognized such a duty in construction cases where the danger arises from foreseeable harm, like a deteriorating façade constituting a threat to passersby below.  <u>Id.</u>; <u>see</u> <u>Duane Reade v. SL Green Operating P'ship</u>, 817 N.Y.S.2d 230, 231 (App. Div. 2006) (allowing tort claim where cold weather caused water pipes to burst).  The damage in this case, inflicted by the intentional acts of terrorists flying jumbo jets laden with highly flammable fuel

into Towers One and Two, causing devastation which spread to 7WTC, cannot be said to be proximate or foreseeable as in the cases that Con Edison cites.  I hold that there was no independent tort duty in this case, and that the first Bridgestone/Firestone exception is unavailable.

The second Bridgestone/Firestone exception applies if the tort claim is "collateral and extraneous" to the allegedly breached contract provision.  Bridgestone/Firestone, 98 F.3d at 20.  Here, on the contrary, the tort claim simply mirrors the reimbursement claim.  As described above, the allegations of ¶ 35, which presents the tort claim, merely elaborate at greater length and with only slightly greater specificity on the similar allegations of ¶ 61, which presents the contractual reimbursement claim.  The tort allegations mention no new events, actors, or circumstances, and concern the same alleged conduct of the Port Authority.

The third exception, which applies if the tort claim yields "special damages that are not recoverable under the contract," is likewise unavailable.  See id.; SL Green, 817 N.Y.S.2d at 231.  By its tort claims, Con Edison seeks principally to recover the cost of rebuilding the substation, replacing its equipment, and removing debris.  Con Edison seeks identical relief by its reimbursement claim, and that is the relief for which it bargained, subject to the conditions stated in Section 16 of the lease.  Although tort damages may exceed contract damages, parties are free to limit the scope of recoverable damages by the provisions of their contract.  That is what Con Edison and the Port Authority did in their lease.  Con Edison seeks consequential damages of at least $100 million for interruption of business and the costs of supplying interim power before the new substation was completed, but Section 8(b) of the lease forbids just such allegations, for Con Edison agreed by that provision not to bring any claim for consequential damages based on the Port Authority's exercise of its Section 8(a) rights.  In sum,

the lease expressly disallows any tort damages that may exceed a recovery under Section 16 of

the lease.  Con Edison may not allege that, because it waived by the lease the right to seek

certain categories of damage, its claims constitute "special damages" that, though not

recoverable in contract, nevertheless may be recoverable in tort.  See Bridgestone/Firestone, 98

F.3d at 20.

       I note that Section 40(b) of the lease expressly contemplated negligence claims by

Con Edison against the Port Authority in certain, very limited, circumstances.  It provided:

> [T]he Port Authority shall not be liable to [Con Edison] or to any
> person for injury or death to any person or persons whomsoever or
> damage to any property whatsoever at any time in or about the
> premises [from causes including precipitation, gas, explosives,
> smoke, and electricity] unless said damage, injury or death shall be
> due to the negligence of the Port Authority.

However, Section 40(b) did not grant that which Section 16 limited.  Section 40(b) provided

specifically that it shall not "be deemed to relieve the Port Authority of its obligations under

Section 16."  If the Port Authority's "acts or omissions" cause damage, whether by negligence or

not, Con Edison's remedy is limited to reimbursement, not damages generally.  Further, Section

8(b) of the lease bars Con Edison from making "any claim or demand for damages,

consequential or otherwise," based on the Port Authority having exercised its Section 8(a) right

to enact 7WTC.  Con Edison's effort to allege tort claims, justified by demands for damages

larger than the lease allows, is not legally sustainable.

       In summary, I hold that the 1968 lease comprehensively set out the nature and

conditions of the Port Authority's liability to Con Edison, and that there is no room for extra-

contractual tort claims that duplicate Con Edison's claim under the lease, or seek to enlarge Con

Edison's entitlements.  Section 16, and its limiting conditions, provides the only avenue by

which Con Edison may recover for the Port Authority's acts or omissions, negligent or not, in

connection with constructing or maintaining 7WTC.

### c. The Negligence Per Se Claim

I dismiss Count Two, the negligence per se claim, for the reasons stated above. In addition, I note that Con Edison has not alleged that the Port Authority or its agents violated any particular state statute. See In re Sept. 11 Prop. Damage & Bus. Loss Litig., 468 F. Supp. 2d at 522-23 (citing Elliot v. City of New York, 95 N.Y.2d 730 (2001) (holding that only violations of state statutes can constitute negligence per se)). Instead, the Second Amended Complaint alleges only violations of "New York City and State fire and safety codes, regulations and practices," see 2d Am. Compl. ¶ 40, briefly specified, for the first time, in Con Edison's third post-argument submission, see Pl's Mem. (June 15, 2009). I dismiss Count Two for this additional reason.

Accordingly, I dismiss Counts One and Two of the Second Amended Complaint.

### V. Conclusion

I grant judgment for Plaintiffs on Count Three of the Second Amended Complaint in the amount of $17,580,750, the remaining balance due after the Port Authority's initial advance of $20 million of insurance proceeds, plus pre-judgment interest in an amount to be determined. I dismiss Count Four, the reimbursement claim, and also dismiss Count One and Count Two, the tort claims.

The Clerk shall mark the motion (Doc. #139) as terminated, and the case (02 Civ. 7188) as closed.

SO ORDERED.

Dated:   July **27**, 2009
         New York, New York

ALVIN K. HELLERSTEIN
United States District Judge

30