```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
                                                             :   ORDER AND OPINION
IN RE SEPTEMBER 11 LITIGATION                                :   RESOLVING MOTIONS FOR
                                                             :   SUMMARY JUDGMENT ON
------------------------------------------------------------ :   THE PORT AUTHORITY'S
CONSOLIDATED EDISON COMPANY OF                               :   CLAIMS FOR
NEW YORK, INC., et al.,                                      :   INDEMNIFICATION
                                                             :
                                  Plaintiffs,                :   21 MC 101 (AKH)
                                                             :
                      -against-                              :   02 Civ. 7188 (AKH)
                                                             :
THE PORT AUTHORITY OF NEW YORK                               :
AND NEW JERSEY,                                              :
                                                             :
                                  Defendant.                 :
------------------------------------------------------------ :
CERTAIN UNDERWRITERS AT LLOYDS,                              :
LONDON, et al.,                                              :
                                                             :
                                  Plaintiffs,                :
                                                             :
                      -against-                              :   02 Civ. 7328 (AKH)
                                                             :
THE PORT AUTHORITY OF NEW YORK                               :
AND NEW JERSEY                                               :
                                                             :
                                  Defendant.                 :
                                                             :
------------------------------------------------------------ x
```

ALVIN K. HELLERSTEIN, U.S.D.J.:

        The Port Authority of New York and New Jersey seeks [1] to be indemnified by Citigroup, Inc. and its affiliates ("Citigroup") for liability and defense expenses

---

[1] Early in the 21 MC 101 litigation, at the request of the parties and for the purposes of economy and efficiency, I agreed that third-party claims for indemnification would not have to be filed; each defendant would be deemed to have asserted them against all other defendants. See Amended Case Management Order, In re Sept. 11 Litig., 21 MC 101 (AKH) (Doc. No. 130) (S.D.N.Y. June 30, 2006); Order, In re Sept.

incurred by the Port Authority in the two lawsuits identified in the caption: <u>Consolidated Edison Company of New York, Inc. v. The Port Authority of New York and New Jersey</u>, 02 Civ. 7188, and <u>Certain Underwriters at Lloyds, London v. The Port Authority of New York and New Jersey</u>, 02 Civ. 7328.

In <u>Consolidated Edison</u>, I held that the Port Authority's liability was limited to paying ConEd the insurance proceeds that the Port Authority had recovered that were attributable to ConEd's damaged substation, and I dismissed the balance of ConEd's claims.[2]  In <u>Certain Underwriters at Lloyds</u>, Citigroup's subrogated insurers (collectively "Lloyds") had sued the Port Authority for negligence in connection with the destruction of Citigroup's property and tenancy.  They settled with the Port Authority and dismissed their claims with prejudice.[3]

Both lawsuits arose from the intense fires and collapse of Tower Seven of the World Trade Center complex on September 11, 2001.  The plaintiffs in the two lawsuits alleged that the fires were made more intense, and that Tower Seven was caused to collapse, by diesel tanks and emergency generator systems within Tower Seven.[4]

---

11 Litig., 21 MC 101 (AKH) (Doc. Nos. 21) (S.D.N.Y. June 23, 2005).   The motions before me—by the Port Authority for summary judgment on its indemnification claim against Citigroup, and by Citigroup for summary judgment dismissing the Port Authority's claim—are based on these deemed cross-claims.
[2] <u>In re Sept. 11 Litig.</u>, 640 F. Supp. 2d 323, 330-43 (S.D.N.Y. 2009).
[3] <u>Certain Underwriters at Lloyds, London v. The Port Authority of New York and New Jersey</u>, 02 Civ. 7328 (AKH) (Doc. No. 42) (S.D.N.Y. July 7, 2008).
[4] <u>In re Sept. 11 Property Damage and Business Loss Litig.</u>, 468 F. Supp. 2d 508, 515-18 (S.D.N.Y. 2006) (holding City of New York immune from liability in Tower 7 litigation under New York Defense Emergency Act); <u>id.</u> at 519-520 (denying Port Authority's motion to dismiss, holding that complaint sufficiently alleged proximate cause); <u>id.</u> at 520-33 (denying Port Authority's motion to dismiss claims brought by ConEd's subrogated insurers, holding that whether claims were based on risks against which subrogees insured was not clear from complaint); <u>id.</u> at 522-23 (granting Port Authority's motion to dismiss claims based on negligence per se, holding that complaint failed to identify a particular state statute that Port Authority violated); <u>id.</u> at 531-33 (granting design, construction and contractor defendants' motion to dismiss negligence claim, holding that they did not owe duty of care to ConEd); <u>id.</u> at 534-35 (denying owning and managing defendants' motion to dismiss negligence claim, holding that extent of their duty to ConEd was not yet known); <u>id.</u> at 535-36 (denying construction and design defendants' motion to dismiss product liability claims but requiring plaintiffs to set out precise defects that they allege)

2

The Port Authority, as support for its claim that it should be indemnified by Citigroup for its defense of the ConEd lawsuit and any potential judgment, and for its defense costs in the Lloyds lawsuit, relies on provisions in two agreements between the Port Authority and Citigroup's predecessors in interest, to be discussed presently.

**I. Background**

    **(a) The Port Authority's Ownership of Tower Seven**

The Port Authority, a bi-state governmental entity created in 1921 by compact between New York and New Jersey, owns the 16-acre World Trade Center site in lower Manhattan. In 1968, it entered into a fifty-year lease with ConEd to construct a substation to provide electricity to the site and the office towers that were proposed, and to other customers nearby. The Port Authority reserved the right to construct a building above the substation.

In 1980, the Port Authority entered into an agreement with an entity controlled by developer Larry Silverstein, 7 World Trade Company, L.P. ("Silverstein"), that gave Silverstein the right to build Tower Seven above the substation and to lease units in the tower to commercial tenants. The Port Authority retained ownership and ultimate control over the design and construction of the building and subsequent tenant alterations. Silverstein agreed to submit its plans for the building to the Port Authority for approval. Silverstein completed construction of the tower in 1987.

    **(b) Citigroup's Tenancy**

On November 23, 1988, Salomon Brothers, which later merged into Citigroup,[5] entered into a lease with Silverstein for approximately half the space in Tower Seven, to commence October 1, 1990, and to be preceded by various agreed alterations.

---

[5] Hereafter, I will refer to Salomon Brothers as "Citigroup" or "Salomon."

Lease § 3.01, Ex. B § 1.05(a), Ex. C.[6]  The alterations were to provide for two diesel fuel tanks and a backup generator, id. Ex. C § V(D), designed to supply uninterrupted power to Salomon's trading floor, independent of any disruptions or curtailments of normal supplies of power, to enable Salomon to operate its trading floor twenty-four hours a day, seven days a week.

Two additional agreements fixed the relationships of the parties.  The Three Party Agreement, entered into by the Port Authority, Citigroup, and Silverstein, described the process by which the Port Authority would review and approve Citigroup's proposed alterations, and provided a form for Tenant Alteration Applications that Salomon was required to submit along with its plans and designs.  The Consent Agreement provided the terms and conditions pursuant to which the Port Authority was to consent to Citigroup's leasehold.

Section 5 of the Consent Agreement described Salomon's obligations to indemnify the Port Authority for, and to hold it harmless against, all reasonable costs, expenses and liabilities arising from Salomon's "operation, maintenance or management" of the demised premises, or from "work done" or "condition created" in the demised premises "during the Term" of the leasehold, or from any "negligent or otherwise wrongful act or omission" of Salomon or of its subtenants or licensees.  It provides, in relevant part:

> Salomon shall indemnify and hold harmless the Port Authority and its agents against and from (a) any and all claims (i) arising from (A) the operation, maintenance or management by Salomon of the Demised Premises, or (B) any work or thing whatsoever done, or any condition created in or about the Demised Premises during the Term by Salomon, its contractors, licensees, agents, servants, employees, subtenants, invitees or

---

[6] The Lease is excerpted at Ex. 4 to the Declaration of Jill L. Berry ("Berry Decl.") and at Ex. V to the Declaration of Kristen M. Santillo ("Santillo Decl.").

4

> visitors, or (ii) arising from any negligent or otherwise wrongful act or omission of Salomon or any of its subtenants or licensees or its or their employees, agents, visitors, invitees or contractors or subcontractors of any tier, and (b) all reasonable costs, expenses and liabilities incurred in or in connection with each such claim or action or proceeding brought thereon. In case any action or proceeding shall be brought against the Port Authority by reason of any such claim, Salomon, upon notice from the Port Authority, shall defend such action or proceeding.

Berry Decl. Ex. 7 ("Consent Agreement").

Rider B to the Tenant Alteration Applications also provided an indemnification by Salomon to the Port Authority. The indemnification covered injuries or damage to the Port Authority or its property arising out of or in connection with "the performance of the work," whether arising out of "acts or omissions of the Contractor or the owner or their contractors," except to the extent that the Port Authority (owner's) acts or omissions "do not constitute gross negligence or willful misconduct of the Port Authority." Rider B provided:

> (A) [Salomon] shall indemnify and hold harmless the Port Authority, its commissioners, officers, agents and employees, against and from (a) injuries (including wrongful death) or damage to it or them or to its or their property, arising out of or in connection with the performance of the work, and (b) claims and demands by third persons, arising or alleged to arise out of the performance of the work, whether such risks arise out of acts or omissions of the Contractor or the owner or their contractors or out of acts or omissions (to the extent the same do not constitute gross negligence or willful misconduct) of the Port Authority."
>
> (B) If so directed, [Salomon] shall at its own expense defend any suit based upon any such claim or demand (even if such suit, claim or demand is groundless, false or fraudulent).

Berry Decl. Ex 6 ("Three Party Agreement") § 7.3, Ex. E, Rider B. Rider F to the Tenant Alteration Applications also provided an indemnification, similar to Rider B. Rider F provided, in relevant part,

> [Salomon] shall indemnify and hold harmless the Port Authority, its Commissioners, officers, agents and employees, against and from (a) any and all claims of injuries (including wrongful death) or damage to it or them or to its or their property, arising out of or in connection with the performance of the work, and (b) claims and demands by third persons, arising or alleged to arise out of the performance of the work, whether such risks arise out of acts or omissions of the [Salomon], its contractors, or out of acts or omissions (to the extent the same do not constitute gross negligence or willful misconduct) of the Port Authority, except where indemnity would be precluded by New York State General Obligations Law.

Three Party Agreement § 7.5, Ex. E, Rider F.

The parties agree that the design of Citigroup's backup generator and diesel fuel tanks and system, the approval of the design by Silverstein and by the Port Authority, and the work performed by Salomon's contractors to install Salomon's backup generator and diesel fuel tanks and system were completed during the period of initial work prior to the commencement of the lease.  56.1 Stmts. ¶ 20.  Citigroup's lease term began October 1, 1990 and was to expire on September 20, 2010.  Lease § 3.01.

In 1998, the Office of Emergency Management of the City of New York leased the 23rd floor of Tower 7 to build a command bunker for use during emergencies. To ensure a consistent and reliable supply of electricity for operations and communications, independent of power outages and curtailments in the public power system, it designed and installed a backup generator and two diesel fuel tanks.

On the morning of September 11, 2001, terrorists flew two jumbo jets into Towers One and Two of the World Trade Center complex, causing intense fires and the collapse of the two towers.  Falling debris from the burning and collapsing towers ignited Tower 7, leading to its collapse later that day at 5:20 p.m.

**(b) The Litigation**

The lawsuits that arose out of Tower 7's collapse, including those brought against the Port Authority by ConEd and Lloyds, contained allegations of fault and proximate cause relating to the diesel fuel systems within Tower 7.

**(i) ConEd's lawsuit against the Port Authority**

ConEd, in its Second Amended Complaint, alleged four claims against the Port Authority to recover for the destruction of its substation and equipment. The first was for negligence based predominately on alleged design defects in the diesel fuel tanks in Tower 7 and the Port Authority's ultimate control over their design, installation and maintenance. ¶ 35. The complaint refers specifically to the generator and diesel fuel tanks installed for the City of New York's emergency bunker, ¶¶ 12-15, and generally to "all diesel fuel storage tanks, pumps, generators and related systems." ¶ 18; see also ¶¶ 35, 61. The complaint does not refer specifically to Citigroup's generator and diesel fuel tanks.[7]

The second claim, alleging negligence per se, alleges that the Port Authority "failed to properly apply, interpret and enforce New York City and State fire and safety codes, regulations and practices." ¶ 40.

Claims three and four are based on provisions in ConEd's lease agreement. ConEd alleges that the lease required the Port Authority to obtain insurance for ConEd's substation and, also, to reimburse ConEd for damages caused by the Port

---

[7] Although not directly at issue in this case, ConEd's subrogated insurers brought an additional lawsuit arising out of Tower 7's collapse, Aegis Insurance Services, Inc. v. 7 World Trade Center Co., L.P., 04 Civ. 7272, against a number of defendants including Citigroup. That suit did not name the Port Authority as a defendant. Unlike ConEd's complaint, the complaint in that case expressly alleged Citigroup's negligence with respect to its backup generator system. See, e.g., Second Am. Compl. ¶ 125 ("Citigroup was negligent in the design, construction, installation and use of [its emergency generator] system. Its negligence directly led to an increase in fire damages and the ultimate collapse of 7 WTC on September 11, 2001.").

Authority's acts or omissions in connection with the construction and maintenance of Tower 7.  ¶¶ 43-63.

ConEd moved for summary judgment on Claims three and four.  I held that ConEd could recover only to the extent of the Port Authority's insurance recovery on its behalf and I dismissed the rest of its claims.  In re Sept. 11 Litig., 640 F. Supp. 2d 323 (S.D.N.Y. 2009).  I held (1) that ConEd was immediately entitled to the full amount of insurance proceeds that the Port Authority recovered on the policy it was required to procure for ConEd's benefit, id. at 330-32; (2) that the Port Authority's obligation to reimburse ConEd for damages to the substation resulting from the Port Authority's acts or omissions was limited to damage that was temporally proximate to the Port Authority's construction or maintenance of Tower 7 and did not extend to damages resulting from latent design defects, id. at 332-37; and (3) that ConEd's negligence claim failed because the Port Authority did not owe ConEd a duty independent from the lease agreement.  Id. at 337-43.

ConEd's appeal is pending.

### ii. Lloyds' Lawsuit against the Port Authority

Lloyds sued the Port Authority to recover insurance paid to Citigroup under Lloyds policies that covered Citigroup's destroyed property in Tower 7.  Lloyds, in a two count complaint, alleged that the Port Authority was negligent in failing to exercise reasonable care when reviewing and approving the allegedly deficient backup generator and diesel fuel tanks installed to provide electricity to the City of New York's emergency command bunker, and negligent per se in failing "to comply with, adhere to, apply, interpret and enforce New York City and State fire and safety codes and regulations."

Second Am. Compl. ¶¶ 13-28, 32-37, 38-43. Since Lloyds sued as subrogee of its insured, Citigroup, it did not allege that Citigroup was negligent or otherwise responsible for Tower 7's collapse.

The parties resolved the case privately and dismissed it by stipulation pursuant to Rule 41(a)(1)(ii) of the Federal Rules of Civil Procedure. See Certain Underwriters at Lloyds, London v. The Port Authority of New York and New Jersey, 02 Civ. 7328 (AKH), Doc. No. 42 (S.D.N.Y. July 7, 2008).

The Port Authority now argues that the claims brought by Lloyds and ConEd triggered Citigroup's indemnification obligations under § 5 of the Consent Agreement and Riders B and F to the Tenant Alteration Applications of the Three Party Agreement.

I hold in this opinion that the indemnification provisions of the lease and the Third Party Agreement are not ambiguous and do not cover the claims alleged against the Port Authority by ConEd and Lloyds. I grant Citigroup summary judgment and dismiss the Port Authority's claim for indemnification. I rule also that Citigroup is not liable for the Port Authority's defense costs

**II. Discussion**

To succeed on a motion for summary judgment, the moving party must show that "there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A "genuine issue" of "material fact" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The court must "resolve all ambiguities, and credit all factual inferences that could rationally

be drawn, in favor of the party opposing summary judgment." Roe v. City of Waterbury, 542 F.3d 31, 35 (2d Cir. 2008) (citations omitted). However, "[m]ere speculation and conjecture is insufficient to preclude the granting of the motion." Harlen Assocs. v. Vill. of Mineola, 273 F.3d 494, 499 (2d Cir. 2001).

"[S]ummary judgment when interpreting a contract may be granted only when 'the intent of the parties can be ascertained from the face of their agreement.'" Postlewaite v. McGraw-Hill, Inc., 411 F.3d 63, 67 (2d Cir. 2005) (quoting Ruttenberg v. Davidge Data Sys. Corp., 626 N.Y.S.2d 174, 178 (App. Div. 1995)); see also Wards Co. v. Stamford Ridgeway Assocs., 761 F.2d 117, 120 (2d Cir. 1985) ("In an action on a contract . . . summary judgment is perforce improper unless the terms of the agreement are wholly unambiguous." (internal quotation mark omitted)). On the other hand, "when the meaning of the contract is ambiguous and the intent of the parties becomes a matter of inquiry, a question of fact is presented which cannot be resolved on a motion for summary judgment." Postlewaite, 411 F.3d at 67; see NFL Enters. LLC v. Comcast Cable Comm's, LLC, 851 N.Y.S.2d 551, 557 (App. Div. 2008) (same).

"Under New York law, the presence or absence of ambiguity is determined by looking within the four corners of the document, without reference to extrinsic evidence." Chapman v. N.Y. State Div. for Youth, 546 F.3d 230, 236 (2d Cir. 2008) (citing Kass v. Kass, 91 N.Y.2d 554, 566 (1998)). "An agreement is ambiguous when 'the agreement on its face is reasonably susceptible of more than one interpretation.'" Nappy v. Nappy, 836 N.Y.S.2d 256, 257 (App. Div. 2007) (quoting Chimart Assocs. v. Paul, 66 N.Y.2d 570, 573 (1986)). Thus, "[w]here contractual language is susceptible of at least two fairly reasonable interpretations, this presents a

10

triable issue of fact, and summary judgment [is] improper." Garza v. Marine Transp. Lines, Inc., 861 F.2d 23, 26 (2d Cir. 1988) (internal quotation marks omitted). However, "if 'a contract is straightforward and unambiguous, its interpretation presents a question of law for the court to be made without resort to extrinsic evidence.'" Postlewaite, 411 F.3d at 67 (quoting Ruttenberg, 626 N.Y.S.2d at 175).

In this case, the parties agree that the provisions of the lease and riders are clear. The extensive discovery has not shed any light on the parties' intentions differing from their written expressions in their lease and riders. Although the parties differ as to how they now interpret the indemnification provisions of the lease and riders, the court is competent to interpret the relevant provisions and resolve their differences. "A contract is not ambiguous merely because the parties argue for different interpretations." Chiquita Int'l Ltd. v. Liverpool and London S.S. Prot. & Indem. Ass'n Ltd., 124 F. Supp. 2d 158, 164 (S.D.N.Y. 2000).

**(a) The Claims for Indemnification in Relation to the Contractual Covenants**

The Port Authority contends that the allegations of the ConEd and Lloyds lawsuits trigger Citigroup's indemnification obligations, even though the allegations of the two lawsuits focus on the design of the City's emergency power system, rather than Citigroup's system, and charge the Port Authority with negligence in its review of the City's design of the system. The Port Authority argues that the allegations in the complaints are broad enough to encompass Citigroup's diesel tanks and backup generator.[8]

---

[8] The Port Authority also argues that the Lloyds lawsuit triggered the indemnification provisions because Lloyds' claims were based on fires in the building that were fueled by the contents of Citigroup's offices.

11

Even if the allegations are sufficiently broad to implicate Citigroup's conduct—and I doubt that they are—the language of the indemnification clauses make clear that the indemnification obligations do not extend to claims regarding latent design defects in Citigroup's diesel fuel system and backup generator.

Section 5(a)(i) of the Consent Agreement does not apply because the design and installation of Citigroup's diesel fuel system and backup generator, to which the complaints allegedly refer, occurred during the period of initial work, before the lease term began, and not in the "operation, maintenance or management" or "during the Term" of Citigroup's lease.  The Port Authority has disclaimed reliance on Section 5(a)(ii) of the Consent Agreement because, as counsel for the Port Authority stated during oral argument, "there hasn't been a finding of negligence on the part of Salomon." Tr. of Oral Argument at 17, In re Sept. 11 Litig., 21 MC 101 (S.D.N.Y. Feb. 24, 2010) (Doc. No. 1092).

Riders B and F to the Tenant Alteration Applications are limited to claims arising out of or in connection with "the performance of the work."  The provision requires indemnification only of claims that arise out of the activity of performing work during the period of active construction, and not claims related to latent design defects. The contract provisions surrounding Riders B and F make clear that the term "performance of the work" applies only to the period of active construction.  See, e.g., Berry Decl. Ex. 14 at Ex. E, Terms and Conditions ¶ 10(a) ("Prior to the commencement of the work and throughout the performance thereof, [Citigroup] shall erect and maintain . . . barriers, shields and other suitable protective devices for the protection of the

---

There are not, however, any allegations relating to Citigroup's office contents in Lloyds' complaint, nor does Lloyds ever argue that these office contents caused or exacerbated the fires that brought down the building.

public."; "The work shall be performed in such manner as will cause the minimum inconvenience to members of the public."; "During the performance of the work, [Citigroup] shall not permit the accumulation in or about the space of any debris, rubbish or litter of any sort resulting from such performance, and shall make arrangements for the frequent removal thereof."). The term "performance of the work" would be rendered senseless if it were interpreted to extend beyond the period of active construction, and to encompass latent design defects. It is a "well-established principle[] of contract interpretation . . . that all provisions of a contract be read together as a harmonious whole, if possible." Schlaifer Nance & Co. v. Estate of Warhol, 119 F.3d 91, 100 (2d Cir. 1997).

Moreover, interpreting Riders B and F to require indemnification for claims arising out of the period of Citigroup's active construction, and not out of latent design defects, makes sense commercially. It is reasonable that the Port Authority would require Citigroup to indemnify it for claims arising out of accidents that occur on an active construction site, but not for claims related to the design and placement of Citigroup's backup generator, which the Port Authority reviewed and approved before Citigroup was permitted to commence construction. See Three Party Agreement § 5.1(b).

Finally, an opinion of the New York Court of Appeals, involving similar contract language, suggests that the proper interpretation of Riders B and F limits their indemnification provisions to claims arising from the period of active construction. In Inman v. Binghamton Housing Authority, tenants in an apartment house sued the owner of the structure, the architects who designed it and the builder, alleging that their infant son was injured after falling from the house's stoop as a result of defects in the stoop's

13

design and construction. 3 N.Y.2d 137, 142-43 (1957). Focusing on the owner's third party claim against the builder, the New York Court of Appeals interpreted an indemnification clause providing that "[t]he Contractor shall be the insurer of the [owner] . . . and hold [it] harmless against . . . (b) [t]he risk of causing injuries to persons, wrongful death, and property damages, direct or consequential, to the [owner] . . . *arising out of or in connection with the performance of the Work* . . .[, and] (c) [t]he risk of liability or losses suffered by, or claims and demands, just or unjust made by, third persons . . . against the [owner] . . . *arising or alleged to arise out of the performance of the Work*." Id. at 147 (emphasis added). The Court held that the provision "may not reasonably be construed to require the builder to indemnify the [owner] for an accident that occurred some six years after the job had been completed and accepted and which did not arise from any defect in workmanship or in any material used." Id. ConEd's claim against the Port Authority is similarly based on an alleged defect in the design and placement of the backup generators and diesel fuel tanks, and not on any alleged defect in its construction. The fact that Citigroup became a tenant after the period of construction does not, as the Port Authority contends, enlarge the scope of the indemnification provisions in Riders B and F. The provisions are thus limited to claims arising out of the period of active construction.

   I hold for these reasons that the Port Authority's claim for indemnification against Citigroup should be dismissed.

### c. Citigroup's Duty to Defend

   The Port Authority argues that the duty to defend is broader than the duty to indemnify, and that if the indemnitor's obligation covers one claim in a multi-claim

14

action, the indemnitor is required to defend the entire action. Upon this premise, the Port Authority demands that Citigroup pay all the Port Authority's defense costs.

It is true that the duty to defend is broader than the duty to indemnify, but only where the complaint gives rise to a covered claim. Frontier Insulation Contractors, Inc. v. Merchants Mut. Ins. Co., 91 N.Y.2d 169, 175 (1997) ("The duty of an insurer to defend its insured arises whenever the allegations within the four corners of the underlying complaint potentially give rise to a covered claim, or where the insurer has actual knowledge of facts establishing a reasonable possibility of coverage."). Here, there is no covered claim and, where there is no covered claim, the indemnitor does not have a duty to defend. Maryland Cas. Co. v. Continental Cas. Co., 332 F.3d 145, 160 (2d Cir. 2003) ("An insurer owes its insured no duty of defense 'if it can be concluded as a matter of law that there is no possible factual or legal basis on which the insurer will be obligated to indemnify the insured.'" (quoting Frontier Ins. Co. v. State, 87 N.Y.2d 864, 867 (1995))).

As the previous discussion makes clear, the indemnification provisions in section 5 of the Consent Agreement and Riders B and F to the Tenant Alteration Applications do not require Citigroup to indemnify the Port Authority for claims relating to latent design defects in Citigroup's diesel fuel tanks and backup generator system. Because neither ConEd nor Lloyds alleges any covered claim in its suit against the Port Authority, Citigroup has neither a duty to indemnify nor a duty to defend.

**III. Conclusion**

For the reasons set out in this opinion, I grant summary judgment to Citigroup, dismissing the Port Authority's third-party claims for indemnification.

The Clerk shall mark the motions (Doc. Nos. 886 and 948) as terminated.

SO ORDERED.

Dated:  September /, 2010
        New York, New York

_____
ALVIN K. HELLERSTEIN
United States District Judge